Filed 2/1/21  In re Santiago R. CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re SANTIAGO R., a Person Coming Under the Juvenile Court Law. | B305482 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. ALBERT R., Defendant and Appellant. | (Los Angeles County Super. Ct. No. 19CCJP07982A) |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Annabelle G. Cortez, Judge.  Affirmed.

Elena S. Min, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, County Counsel, Kim Nemoy, Assistant County Counsel, and Jacklyn K. Louie, Principal Deputy County Counsel, for Plaintiff and Respondent.

————————————————

Father Albert R. appeals the jurisdictional findings and dispositional orders of the juvenile court concerning his son Santiago R., contending the evidence was insufficient to support the court's findings on the jurisdictional allegations of the dependency petition. We affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.  Initial Investigation and Commencement of Proceedings

Santiago R., born early in 2018, came to the attention of the Department of Children and Family Services (DCFS) after each of his parents was involved in altercations with Albert R.'s girlfriend Amy S. on November 9, 2019. That night, Albert R. told the police Amy S. had punched him on the left side of his face while he was holding Santiago R. in his arms. The police observed swelling on Albert R.'s left cheek. While the police were investigating, Santiago R.'s mother Natalia T. arrived. She and Amy S. became involved in what the police concluded was a mutual battery. Amy S. was arrested. Albert R. obtained an emergency protective order against Amy S.

DCFS examined Santiago R. in December 2019 and found him healthy in appearance and free from any marks or bruises. The paternal great-grandmother told DCFS she had known Natalia T. since Natalia T. was 14 years old, and she was a very good mother. She reported Albert R. had a history of substance abuse but it seemed to be "under control" currently. She was unsure about ongoing safety concerns for Santiago R.

Natalia T. told DCFS she had gone to Albert R.'s home on the night of the incident because Albert R. called and asked her to pick up Santiago R. after Amy S. assaulted him. She

2

acknowledged she argued with Amy S. and they hit each other. Natalia T. denied any prior history of domestic violence with Albert R. or Amy S. She was considering seeking a restraining order against Amy S., but she was concerned about how Albert R. would react. He had once told her if she took full custody of Santiago R. she would "see what happens." Natalia T. did not know what this meant. Natalia T. told DCFS Albert R. had used marijuana and methamphetamines in the past. He said he had stopped using drugs, but Natalia T. did not know if he had relapsed.

On December 3, 2019, Albert R. told a DCFS social worker who was investigating a different referral that Amy S. had "sucker punched me in front of my little sister, but I wasn't holding my son. Actually, it was like a sucker slap. No[,] more like a baby ass slap." He claimed the police became involved because Natalia T. and Amy S. fought. Albert R. accused DCFS of harassing him.

Albert R. spoke with the social worker investigating this matter on December 4, 2019, but he declined to meet with her that day, saying he would be busy accompanying the pregnant Amy S. to a doctor's appointment. He refused to permit DCFS to come to his home, and he disclosed plans to move in with Amy S. Albert R. did not appear on December 6, 2019, for his scheduled appointment, saying he could not find a ride. The social worker offered to meet him at his location, but he refused. Alberto R. missed their rescheduled meeting as well.

On December 6, 2019, the social worker spoke with Natalia T. about her concerns about Albert R. living with Amy S., his avoidance of DCFS, and the possibility he was using drugs. By this time Natalia T. had obtained a restraining order against

3

Amy S. to protect herself and Santiago R. She agreed to permit Albert R. to visit Santiago R. only when supervised by the paternal great-grandmother.

DCFS obtained an order removing Santiago R. from Albert R.'s custody after a December 10, 2019 incident in which Albert R. went to Natalia T.'s place of employment and threatened her. Albert R. left before the police arrived, but that night he went to Natalia T.'s home and broke a window while trying to gain entry. He again fled before the police responded. Natalia T. subsequently obtained a restraining order against Albert R.

Albert R. told DCFS he had broken Natalia T.'s window accidentally and claimed Natalia T. had been keeping Santiago R. from him since the incident with Amy S. The social worker supported Natalia T. keeping Santiago R. away from Albert R. because Albert R. minimized the seriousness of the incident with Amy S. and intended to move in with her. Albert R. said Amy S. had miscarried and they no longer planned to live together.

On December 13, 2019, DCFS filed a dependency petition alleging Santiago R. came within the jurisdiction of the juvenile court under Welfare and Institutions Code[1] section 300, subdivisions (a) (physical abuse) and (b)(1) (failure to protect). Under both subdivisions, DCFS alleged Albert R. and Amy S. "engaged in a violent altercation in which the female companion struck the father['s] face while father was holding the child, inflicting swelling to the father's face. The father minimized the female companion's violent conduct and intended to reside with

---

[1] All further undesignated statutory references are to the Welfare and Institutions Code.

4

the female companion. The father failed to protect the child. The father's female companion's violent conduct and the father's failure to protect the child endanger the child's physical health and safety and place the child at risk of serious physical harm, damage, danger and failure to protect."[2]

Santiago R. was detained from Albert R. and released to Natalia T. Albert R. was granted monitored visitation. The court ordered no contact between Santiago R. and Amy S.

## II. Interviews Prior to the Jurisdictional/Dispositional Hearing

DCFS re-interviewed Natalia T. and Albert R. and spoke with other family and friends before the February 2020 jurisdictional hearing.

---

[2] Under section 300, subdivisions (a) and (b), DCFS also alleged Natalia T. and Amy S. had "engaged in an escalating verbal and a physical altercation in which the mother and the father's female companion struck each other in the child's presence. The father's female companion sustained scratches to her face and neck. The violent conduct between the mother and the father's female companion endangers the child's physical health and safety and places the child at risk of serious physical harm, damage, and danger." Additionally, under section 300, subdivision (b)(1) only, DCFS alleged Albert R. had a history of substance abuse, including methamphetamine, his current use of marijuana rendered him incapable of providing regular care and supervision to Santiago R.; and Natalia T. knew about Albert R.'s substance abuse but failed to protect Santiago R. At DCFS's request, the trial court later amended the petition by interlineation to remove all references to Natalia T.; the court also dismissed the allegation concerning Albert R.'s substance abuse.

A.    *Interview of Natalia T.*

Natalia T. told DCFS Albert R. was her first serious boyfriend; they met in high school and were together for eight years.  They had been best friends and supported each other, and Natalia T. encouraged him to do better in school.  Albert R. was diagnosed with attention deficit hyperactivity disorder in 2013.  He discontinued his prescribed medication because it made him sleepy.  Around that time, Albert R. became verbally aggressive toward Natalia T.  There was also "mutual pushing and shoving" but it did not escalate to the point of any injuries.  Natalia T. and Albert R. realized it was not healthy to act aggressively toward each other.  They agreed to communicate better and improve their relationship, even if it meant they needed to separate.  Over the years they broke up several times and then reconciled.  There was no violence in the breakups, and overall their relationship had improved.

In 2015, however, Albert R. came to Natalia T.'s home unannounced when she was alone.  Natalia T. did not know it at the time, but he had begun using methamphetamine.  He acted paranoid, accused her of dating someone else, and asked to see her iPod, presumably to investigate whether she was dating.  Natalia T. thought Albert R. might keep the iPod and ran to hide it.  She tripped and fell, and Albert R. got on top of her and covered her mouth and nose with his hand.  She had difficulty breathing.  Albert R. did not seem to realize what he was doing "until he saw himself on top of her while she was trying to gasp for air."  Looking scared, he fled the house.  Natalia T. obtained a restraining order the following day.  Albert R. stayed away for approximately six months, after which time she revoked the restraining order and they resumed dating.

6

In 2016 Natalia T. learned Albert R. had been using methamphetamine. She supported him and accompanied him to Alcoholics Anonymous and Narcotics Anonymous meetings. In 2017 Albert R. relapsed and smoked marijuana, but to the best of Natalia T.'s knowledge, Albert R. had been sober for several years.

Although they broke up in June 2019, Natalia T. felt they had communicated and coparented successfully. They went on family outings and informally agreed on custody and a visitation schedule. Santiago R. had overnight visits with Albert R. starting in August 2019. At the time Natalia T. had no concerns about Santiago R.'s safety or Albert R.'s ability to care for him. He was a good father. She and Albert R. agreed to inform each other if either began dating.

Albert R. began dating Amy S. in September 2019. Natalia T. heard from Albert R.'s family that his relationship with Amy S. was not healthy. Albert R. told her Amy S. was "getting violent," but he provided no details. He dismissed Natalia T.'s concerns about finding pinch marks on Santiago R. when he returned home after visits. Natalia T. told him she did not want Amy S. present when Santiago R. was visiting. Albert R. responded defensively, but in October 2019, he reported he was no longer involved with Amy S. Natalia T. did not fully believe Albert R. because she saw photos of them on social media. She asked him again not to expose Santiago R. to Amy S., and Albert R. again assured her they were no longer dating.

On the day of the altercations Natalia T. learned Albert R. was still dating Amy S. She did not see the physical altercation between Albert R. and Amy S., and Albert R. gave her two different accounts of what happened. When he telephoned her

the night of the incident, he told her Amy S. had hit him while he was holding Santiago R. Later, however, Albert R. said he had not been holding him.

Natalia T. reported to DCFS she called Amy S. a profane word when she arrived at Albert R.'s home. Amy S. tried to hit Natalia T., but missed; she did however, hit Natalia T.'s sister, who had accompanied Natalia T. The police intervened, and Amy S. was arrested while Natalia T. was allowed to continue on to Albert R.'s apartment.

After the incident Natalia T. no longer permitted Albert R. to have overnight visits with Santiago R., although he could visit Santiago R. at the home of the paternal grandmother. This restriction upset Albert R. Albert R. was also unhappy when Natalia T. canceled a visit. He came to her home unannounced and began to knock at her door and kitchen window. She told him to leave or she would call the police, but he wanted to talk about visitation. Albert R. knocked at the door and window approximately five times—and the final time, he broke the window. Natalia T. did not know whether Albert R. intended to break it, but he used a lot of force. Natalia T. called the police. Albert R. left before the police arrived but spoke with them by phone, claiming Natalia T. was holding the child hostage and would not allow him to see his son. Although Natalia T. told the police about the DCFS investigation, the police told her unless there was an order preventing Albert R. from seeing Santiago R. he had a right to see his child. Natalia T. obtained a restraining order against Albert R. the following day.

Natalia T. told DCFS she was concerned about Albert R.'s anger management issues and mental health stability, as she had observed him to have rapid mood changes, particularly with

8

respect to visitation and custody issues. Prior to DCFS's involvement with the family, Albert R. had agreed to give her full custody of Santiago R., but now he was demanding custody of Santiago R. 30 percent of the time. She feared they would no longer be able to coparent cooperatively.

Natalia T. believed Albert R. would not stop dating Amy S. Albert R. had said Amy S. was "toxic," but when she advised him to leave her, Albert R. said he wanted to help Amy S. Natalia T. felt upset Albert R. had placed someone else ahead of Santiago R.'s safety; she feared he would again prioritize others over their son. As she did not trust Albert R. would keep Santiago R. away from Amy S., she wanted sole custody. Natalia T. told DCFS she would attempt to be firm in keeping Santiago R. from Albert R. when he was in a hostile relationship.

B.    *Interview of Albert R.*

Albert R. admitted he had used marijuana and began to use methamphetamines at age 15. He had been clean since March 2016. Albert R. had received unconditional support from Natalia T. and a security guard from his high school, Karen S. Karen S. took him to church and to his first Alcoholics Anonymous and Narcotics Anonymous meetings. Albert R. attended meetings weekly.

Albert R. said he and Natalia T. were together for eight years with no domestic violence. As for the 2015 incident reported by Natalia T., Albert R. said Natalia T. got a restraining order at the request of her mother after he and Natalia T. argued. According to Albert R., the apartment manager was threatening to force them to move out, and he (Albert R.) did not want to jeopardize their housing, so they made up accusations he had been violent.

9

Describing the November 9, 2019 incident, Albert R. told DCFS he found it amusing when Amy S. slapped his face, and he asked her, "Was that a love tap?" There was no other physical altercation between them. Amy S. claimed he had hit her and threatened to call law enforcement, but he had never been physically abusive to her. When Amy S. called the police, Albert R. telephoned Natalia T. and told her he would leave Santiago R. with his mother if he was arrested. He told Natalia T. Amy S. had hit him.

Albert R. now claimed he had told the police Amy S. slapped him while he was holding Santiago R.'s hand. He denied any intent to minimize the situation but felt it was not a big deal: She did not use excessive force, she did not cause injuries or bruising, and he laughed when it happened. He said the police recommended pressing charges, but he refused because what Amy S. did was not serious.

Albert R. said he had been in contact with Amy S. until early January 2020. He had felt responsible for her while she was pregnant. Amy S. had a difficult childhood and a violent relationship with her son's father, and Albert R. wanted to ensure she was doing well. He understood he was not to have contact with Amy S. due to safety concerns. He had changed his telephone number, did not give Amy S. his new number, and had not spoken with her.

Albert R. said Santiago R. had always been and would continue to be his priority. He wanted to complete his education and earn enough money to provide for his son.

C.    *Interview of Paternal Great-Grandmother*

The paternal great-grandmother told DCFS Albert R.'s family had concerns about Amy S. The couple often argued and

10

their relationship was unhealthy. Amy S. was not allowed to visit while Albert R. stayed in the great-grandmother's home.

Natalia T. was a wonderful mother who had been good to Albert R. The paternal great-grandmother had never known Albert R. to be aggressive and expected he would not strike a woman. He had never used drugs in her presence and she had never observed him to be under the influence of drugs. She believed Albert R. loved Santiago R. and would not hurt him, but he sometimes made "wrong choices, like with that girlfriend [Amy S.]"

D.    *Interview of Family Friend*

Karen S., a family friend who worked as a security guard at the high school Natalia T. and Albert R. had attended, told DCFS the couple had a "rocky relationship" during high school. Natalia T. "loves him so much and he worships the ground that she walks on." Natalia T. was the calm one; "she would help Albert calm down." As they got older, they were able to work things out, "and they both wanted to be better for their baby." Karen S. had no concerns for Santiago R. Albert R. was an excellent father.

Albert R. told Karen S. he had gone to Natalia T.'s house to give her money for the window he had broken. He said he had an altercation and "laid hands on" Amy S., and he was remorseful. This surprised Karen S., because she had not known Albert R. to be violent and he was not an aggressive person. Karen S. did not have concerns about violence between Albert R. and Natalia T.

After high school Albert R. told Karen S. he had been using drugs. She introduced him to Alcoholics Anonymous and Narcotics Anonymous and sponsored him for some time. Karen S. reported Albert R. was serious about meetings and attended

consistently. She understood he had not taken drugs in two to three years.

E. *Interview of Maternal Aunt*

The maternal aunt, who had accompanied Natalia T. on the night of the altercations, reported Natalia T. had made a "too loud" comment about Amy S. as they walked past her. Amy S. confronted them and swung at the maternal aunt. The aunt did not have a chance to defend herself. She did not believe Natalia T. and Amy S. physically fought, as the police immediately intervened. Albert R. had a black eye after his conflict with Amy S.

There had been other problems involving Albert R. Before Natalia T. and Albert R. broke up, the police were called when Albert R. screamed at Santiago R. in a store. Also, sometime before the November 9 altercations, Albert R. telephoned Natalia T. and the maternal aunt and said he was going to send his girlfriend to beat them up. Recently, Albert R. had broken the kitchen window when he was upset about Natalia T. suspending visitation. After he broke the window he returned to his car, which was parked next to Natalia T.'s car; they later discovered the tires on Natalia T's car had been "popped."

F. *Interview of Maternal Grandmother*

The maternal grandmother said Albert R. had been violent with Natalia T. at least once. Natalia T. said Albert R. had "put hands on her," so she (the maternal grandmother) took Natalia T. to get a restraining order. Over the years Albert R. and Natalia T. were together, the maternal grandmother said, "[T]here's been times that I've had to call the police or I've had to kick him out of the apartment because he was being disrespectful. He did apologize each time, but he and Natalia would break up and try

12

to work things out. Honestly, this happened when they were still young and before the baby was born. After they matured more and had the baby, there was no violence or anything like that."

Natalia T.'s family did not think Albert R. was "a bad guy"; he had been a great dad. Arranging visits was not initially problematic after the break-up: Albert R. came over to visit Santiago R. and stayed for dinner. But Albert R.'s relationship with Amy S. "just changed him." Natalia T. became concerned about the unhealthy relationship and supervision of Santiago R.

With regard to the broken window, the maternal grandmother said Natalia T. had told her Albert R. had gone to her workplace that day and threatened her about visitation and custody. Albert R. wanted shared custody of the baby, but Natalia T. "didn't see something right with him." He came over that night to try to see Santiago R., but Natalia T. did not feel safe letting the child go with him. They argued through the kitchen window and Albert R. broke it. During this incident, "[t]he baby was in the room and my daughter and I were keeping the baby entertained so he would [not] hear the arguing."

## III.  **Jurisdictional and Dispositional Hearing**

The jurisdictional and dispositional hearing took place on February 21, 2020. DCFS recommended the juvenile court sustain the allegations in the dependency petition and terminate jurisdiction with a family law order awarding Natalia T. sole physical custody. Albert R. asked the court to dismiss the allegations.

Under section 300, subdivisions (a) and (b), the court sustained the allegations that Amy S. struck Albert R. while he was holding Santiago R., he minimized her conduct and intended to reside with her, and he failed to protect Santiago R. The court

13

declared Santiago R. a dependent of the juvenile court but
released him to the home of parents.  Albert R. appeals.

## DISCUSSION

I. **Jurisdiction**

We review the juvenile court's jurisdictional findings for
substantial evidence.  (*In re Joaquin C.* (2017) 15 Cal.App.5th
537, 560.)  Substantial evidence is evidence that is " 'reasonable,
credible, and of solid value.' "  (*In re I.C.* (2018) 4 Cal.5th 869,
892.)  Under this standard of review, we examine the full record
in the light most favorable to the findings and conclusions of the
juvenile court and defer to the juvenile court on issues of
credibility of the evidence and witnesses.  (*In re R.T.* (2017)
3 Cal.5th 622, 633.)  We neither reweigh the evidence nor
exercise our independent judgment.  (*In re I.J.* (2013) 56 Cal.4th
766, 773.)  We determine only whether there is any substantial
evidence, contradicted or uncontradicted, that supports the
juvenile court's order (*In re D.L.* (2018) 22 Cal.App.5th
1142, 1146); if so, we must uphold the order even if other
evidence supports a contrary conclusion.  (*In re T.V.* (2013)
217 Cal.App.4th 126, 133.)

The court took jurisdiction over Santiago R. under section
300, subdivisions (a) and (b).  When a dependency petition alleges
jurisdiction under multiple subdivisions, " 'a reviewing court can
affirm the juvenile court's finding of jurisdiction over the minor if
any one of the statutory bases for jurisdiction that are
enumerated in the petition is supported by substantial
evidence.' "  (*In re I.J.*, *supra*, 56 Cal.4th at p. 773.)  We proceed
with our analysis under section 300, subdivision (b)(1), which
authorizes jurisdiction when a child "has suffered, or there is a
substantial risk that the child will suffer, serious physical harm

14

or illness, as a result of the failure or inability of his or her parent . . . to adequately supervise or protect the child . . . ." A jurisdictional finding under section 300, subdivision (b)(1) requires DCFS to demonstrate three elements by a preponderance of the evidence: "(1) neglectful conduct by the parent; (2) causation; and (3) 'serious physical harm or illness' or a 'substantial risk' of serious physical harm or illness." (*In re Yolanda L.* (2017) 7 Cal.App.5th 987, 993.)

Children's exposure to domestic violence may support jurisdiction under section 300, subdivision (b)(1). (*In re Jesus M.* (2015) 235 Cal.App.4th 104, 112–113; *In re T.V.*, *supra*, 217 Cal.App.4th at p. 134; *In re E.B.* (2010) 184 Cal.App.4th 568, 575–576, disapproved on another ground in *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7.) Domestic violence " 'is a failure to protect [the children] from the substantial risk of encountering the violence and suffering serious physical harm or illness from it.' " (*In re E.B.*, at p. 576.)

To support the exercise of dependency jurisdiction under section 300, subdivision (b)(1), DCFS must provide evidence the domestic violence is "ongoing or likely to continue" and it "directly harmed the child physically or placed the child at risk of physical harm." (*In re Daisy H.* (2011) 192 Cal.App.4th 713, 717; accord, *In re M.W.* (2015) 238 Cal.App.4th 1444, 1453.) "[T]here 'must be some reason beyond mere speculation to believe the alleged conduct will recur. [Citation.]' [Citation.]" (See *In re D.L.*, *supra*, 22 Cal.App.5th at p. 1146.) "Although 'the question under section 300 is whether circumstances at the time of the [jurisdictional] hearing subject the minor to the defined risk of harm' [citation], the court may nevertheless consider past events when determining whether a child presently needs the juvenile

15

court's protection." (*In re T.V.*, *supra*, 217 Cal.App.4th at p. 133, italics omitted.) Moreover, " '[t]he court need not wait until a child is seriously abused or injured to assume jurisdiction and take the steps necessary to protect the child.' [Citations.] The focus of section 300 is on averting harm to the child." (*Ibid.*)

The evidence was sufficient to support the exercise of jurisdiction under section 300, subdivision (b)(1). Albert R. was aware prior to the November 9 incident that Amy S. was violent, but he continued to expose Santiago R. to Amy S. despite Natalia T. asking him not to do so. As a result, Santiago R. was present, and in his father's arms, when Amy S. punched Albert R. in the face. Santiago R. could easily have been seriously injured: Amy S.'s blow caused Albert R.'s face to swell, and one witness said he had a black eye, yet Albert R. minimized Amy S.'s conduct: He told DCFS it was just a slap, it was funny, and it was "not a big deal." Albert R. was not truthful about what had occurred on November 9, repeatedly lied about breaking up with Amy S., and, at least for some time after the incident, said he intended to live with her. Given Albert R.'s knowledge of Amy S.'s volatility, his persistent minimization of the seriousness of the incident, and his deception, the evidence supported the court's conclusions he had failed to protect Santiago R. from violence and subjected him to a substantial risk of serious physical harm, and the risk was ongoing.

Albert R. points out he was the victim in the November 9 incident with Amy S., and he did not strike her. These assertions, while consistent with the record, do not tend to establish any error by the juvenile court in finding Albert R. had failed to protect Santiago R. from Amy S.

Albert R. argues he had "no reasonable reason to foresee that [Amy S.] would physically assault him while he was holding his son" because no "actual physical violence had previously occurred in their relationship." As Albert R. acknowledges, however, he knew Amy S. was "getting violent" before the November 9, 2019 altercations. The juvenile court could reasonably conclude on this evidence that Albert R. had reason to foresee that Amy S. would be violent and failed to protect Santiago R. from her.

Albert R. also contends his history of domestic violence with Natalia T. was not sufficient to support the exercise of jurisdiction over Santiago R. He describes the earliest incident as mutual aggression, notes the 2015 suffocation incident occurred while he was addicted to methamphetamine, observes he complied with Natalia T.'s restraining order, and highlights both the parents' initial cooperation and communication after their break-up and Natalia T.'s statement at the jurisdiction hearing that she did not fear him. Albert R. fails to acknowledge the evidence that while the dependency proceedings were pending he went to Natalia T.'s workplace and threatened her, then went to her home unannounced and argued with her, pounding on the window so hard it broke. Santiago R. was in the room when Albert R. broke the window. Albert R. threatened Natalia T. that she would "see what happens" if she took full custody of Santiago R., and he threatened to send Amy S. to beat up Natalia T. and her sister. Natalia T. chose not to pursue a restraining order at the jurisdictional hearing, but the evidence nonetheless supported the court's finding Albert R.'s history of domestic violence, including recent incidents, was probative of

17

current conditions and tended to demonstrate Santiago R. remained at risk of harm.

Finally, Albert R. contends there was insufficient evidence of a substantial risk of harm to Santiago R. at the time of the jurisdictional hearing because by that time, Albert R. had "fully absorbed the threat [Amy S.] presented to Santiago and took affirmative steps" to disassociate himself from her. While Albert R. claimed to have ended his relationship with Amy S. and to recognize the risk she presented, the record also showed Albert R. had lied previously about ending the relationship, changed his account of what happened with Amy S., minimized her conduct, and continued to maintain a relationship with her even after she hit him while he was holding his son. Albert R. characterizes his differing accounts of the November 9 incident as "discrepancies" that are "immaterial," but they are not immaterial: They demonstrate Albert R. adjusted his account of what happened in a violent confrontation in order to minimize the seriousness of Amy S.'s actions and the threat she presented. Additionally, Albert R. had previously assured others he was no longer dating Amy S., but continued the relationship anyway, allowing Amy S. to be present when Santiago R. was with him despite Natalia T.'s opposition and with the knowledge that Amy S. was "getting violent." Given Albert R.'s denial of the severity of the threat posed by Amy S., his dishonesty in reporting, and his concealment of his relationship with Amy S., the juvenile court could reasonably have concluded Santiago R. remained at substantial risk of harm at the time of the jurisdictional hearing despite Albert R.'s claim to have cut off contact with Amy S. and his professed "realiz[ation] he needed to put the safety of his son Santiago before his relationship with her." "A parent's past

conduct is a good predictor of future behavior."  (*In re T.V.*, *supra*, 217 Cal.App.4th at p. 133; see also *In re A.F.* (2016) 3 Cal.App.5th 283, 293 [" '[d]enial is a factor often relevant to determining whether persons are likely to modify their behavior in the future without court supervision' "].)

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

STRATTON, J.

We concur:

BIGELOW, P. J.

GRIMES, J.